**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **HICKORY POINTE, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 3:22-cv-01082** |
| **KNICKERBOCKER PARTITION** | § | |
| **CORPORATION and** | § | |
| **KNICKERBOCKER BATHROOM** | § | |
| **PARTITIONS, L.L.C.** | § | |
| | § | |
| **Defendants.** | | |

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff, Hickory Pointe, LLC, and files this First Amended Complaint for breach of contract against defendants Knickerbocker Partition Corporation and Knickerbocker Bathroom Partitions L.L.C. and alleges as follows:

### I.    PARTIES

1.    Plaintiff is a limited liability company organized and in good standing under the laws of Iowa, doing business in Dallas County, Texas at 3230 Royalty Row, Irving, TX 75062.

2.    Defendant Knickerbocker Partition Corporation is a foreign corporation organized and existing under the laws of New York whose principal office is located at 28 Mackay Way, Roslyn, New York. Defendant Knickerbocker Bathroom Partition L.L.C., is a New York limited liability company registered to do business in Texas, whose principal office is located at 260 Spagnoli Road, Melville, NY 11747, and may be served with process by serving its registered Agent, Christopher Voulgaris, at 3029 E. Randol Mill Road, Arlington, TX 76011.

## II.    JURISDICTION

3.    The Court has jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

## III.    VENUE

4.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this breach of contract claim occurred in this district.

## IV.    FACTS

5.    On or about February 8, 1994, Plaintiff and Knickerbocker Partition Corporation entered into that certain Lease Agreement, as amended from time to time and assigned, (the "Lease") in connection with the real property:

> "[being two spaces of approximately 4350 square feet each out of an approximately 25,650 s.f. office warehouse building located at 3230-40 Royalty Row, Irving, Texas, more fully described as being Lots 24 & 25, Block "A" of the Freeway Industrial District, City of Irving Texas, as recorded in Volume 402, Page 1437, Map Records, Dallas County, Texas, the two lease spaces being known locally as 3230 and 3232 Royalty Row." (the "Premises")

The Lease is attached hereto as Exhibit I.

6.    According to an unexecuted Assignment and Assumption of Lease by and between Defendant Knickerbocker Partition Corporation ("Knickerbocker Partition") and Defendant Knickerbocker Bathroom Partitions, L.L.C. ("Knickerbocker Bathroom") dated January 2018 (the "Assignment"), Knickerbocker Partition assigned, and Knickerbocker Bathroom assumed, its right, title and interest under the Lease. The Assignment is attached hereto as Exhibit II[1].

---

[1] Because the effectiveness of the assignment is unclear, Plaintiff cannot be certain which Defendant is responsible for the damages.  As such, references throughout this Complaint to Defendant is a reference to the party actually liable under the Lease.

7.    Plaintiff purchased the Premises on or about August 19, 2019, and per that certain Bill of Sale and Blanket Assignment dated August 19, 2019 (the "Bill of Sale") was assigned and Plaintiff assumed the Lease. The Bill of Sale is attached hereto as Exhibit III.

8.    On or about November 30, 2021, Defendant moved out from the Premises and the Parties terminated the Lease. Defendant, however, left the Premises in a state of complete disarray with Defendant's property littered throughout as reflected in the following example photos.



























 

9.      On or about December 15, 2021, and January 27, 2022, Plaintiff notified Defendant in writing of the Lease Defaults due to the condition of the Premises. Defendant failed to cure the Defaults or otherwise compensate Plaintiff for the damage.

10.     Section 7.05 of the Lease provides in relevant part, "[u]pon the termination of the Lease, Tenant shall surrender the Property to Landlord, broom clean and in the same condition as received except for ordinary wear and tear…"

11.     As a result of Defendant or Defendants' failure to comply with the terms of the Lease, Plaintiff was forced to clean up the Premises at its own cost and expense in order to return the Premise to the condition required by the Lease.

12.     Additionally, because Defendant left the Premise in such poor condition and requiring such an extensive clean up, Plaintiff was not able to begin the long-planned construction work on the Premise. The delays caused by Defendant's failure to comply with the terms of the

Lease caused Plaintiff to incur additional costs and expense related to the construction work on the premise.

13.    Plaintiff is entitled to recover reasonable and necessary attorneys' fees under the provisions of the Lease as set out in Section 15.08.

**COUNT 1—BREACH OF CONTRACT**

14.    On February 8, 1998, Plaintiff and Defendant executed a valid and enforceable written contract, namely the Lease Agreement attached hereto as Exhibit I. The Lease provides, inter alia, that Defendant was obligated to leave the Premises at move out "broom clean and in the same condition as when received."

15.    Plaintiff fully performed all of Plaintiffs contractual obligations including without limitation providing Defendant with the required notice of default and cure period.

16.    Defendant breached the Lease by failing to leave the Premises in the "broom clean" condition required by the Lease.

**DAMAGES**

17.    Defendant's breach caused injury to Plaintiff, which resulted in the following damages, including without limitation: (1) clean-up costs of $33,392.86; (2) construction delay costs in an amount to be proven at trial; and (3) attorneys' fees.

**PRAYER**

18.    For these reasons, Plaintiff asks that the Court issue citation for Defendant to appear and answer, and that Plaintiff be awarded a judgment against Defendant for the following:

     a.    Actual damages.

     b.    Prejudgment and post-judgment interest.

     c.    Court costs.

d.    Attorneys' fees.

e.    All other relief to which plaintiff is entitled.

Respectfully submitted,
**CONNER & WINTERS, LLP**

By:    /s/      *Matthew K. Good*
MATTHEW K. GOOD (Attorney in Charge)
Texas State Bar No. 24099314
JASON S. TAYLOR
Texas State Bar No: 24008126
1700 Pacific Avenue, Suite 2250
Dallas, TX 75201
Telephone: 214-217-8062
Facsimile: 214-217-8861
Email: mgood@cwlaw.com
        jtaylor@cwlaw.com

## **EXHIBIT I**

## **LEASE AGREEMENT**

[Immediately follows this cover page]

COPY

ARTICLE ONE: BASIC TERMS

1.01.  Date of Lease:       February 8, 1994

1.02.  Landlord:            R & C Investments
       Address of Landlord: 5310 Spring Meadow
                            Dallas, Texas 75229

1.03.  Tenant:              Knickerbocker Partition Corporation
       Address of Tenant:   P. O. Box 3035
                            193 Hanse Avenue
                            Freeport, New York 11520

1.04.  Property (Include street address, as well as legal description and approximate square footage):
       Being two spaces of approximately 4350 square feet each out of an
       approximately 25,650 s. f. office/warehouse building located at
       3230-40 Royalty Row, Irving, Texas, more fully described as being
       Lots 24 & 25, Block "A" of the Freeway Industrial District, City of
       Irving, Texas, as recorded in Volume 402, Page 1437, Map Records, Dallas
       County, Texas, the two lease spaces being known locally as 3230 and
       3232 Royalty Row.

1.05.  Lease Term: Five (5) years _____ beginning on
       February 1, 1994 _____ and ending on January 31, 1999 _____

1.06.  Rent: Two Thousand               February and March, 1994, shall be free months
       Dollars ($2,000.00) per month.   with first payment due April 1, 1994.

1.07.  Security Deposit: -0-.

1.08.  Permitted Use (see Section 6.01):    Lawful uses associated with Tenant's business

1.09.  Principal REALTOR® (If none, so state):   None

       Address:

1.10.  Cooperating REALTOR® (If none, so state):   None

       Address:

1.11.  REALTOR'S® Commissions (See Article Fourteen):   None

       A. Commissions due to the undersigned Principal REALTOR® shall be calculated and paid in accordance with paragraph (a) or (b) or
       Section 14.01 (Strike out inapplicable letter).

       B. The percentage applicable in Sections 14.01 and 14.02 shall be ---------------------------percent (--------%).

1.12.  Base Year for Taxes (see Section 4.02): _1993_____

1.13.  Party to Receive Payments from Tenant Hereunder:

       Landlord/Principal REALTOR® (strike one)

1.14.  Daily Late Charge (See Section 3.03): 5% late charge after 10th day of month
       Dollars ($_____) per day.

1.15.  Acceptance (see Section 15.13):

       The number of days for acceptance shall be ___15_____ days.

ARTICLE TWO:  LEASE AND LEASE TERM

    2.01. Lease of Property for Lease Term. Landlord leases the Property to Tenant and Tenant leases the Property from Landlord for the Lease
Term stated in Section 1.05. As used herein, the "Commencement Date" shall be the date specified in Section 1.05 for the beginning of the Lease
Term, unless advanced or delayed under any provision of this Lease.

ARTICLE THREE: RENT AND SECURITY DEPOSIT

**3.01. Manner of Payment.** All sums to become due hereunder by Tenant shall be made to the party named in Section 1.13 above, at the address stated herein for such party, unless such address is changed as provided herein. Any and all payments made to the Principal REALTOR® for the account of Landlord shall be deemed made to Landlord when received by the Principal REALTOR® . All sums payable by Tenant hereunder, whether or not expressly denominated as rent, shall constitute rent for the purposes of section 502(b) (7) of the Bankruptcy Code.

**3.02. Time of Payment.** Upon execution hereof, Tenant shall pay the rent for the first month of the Lease Term. On or before the first day of the second month of the Lease Term and of each month thereafter, a like monthly installment shall be due and payable, in advance, without off-set, deduction or prior demand. If the Lease Term commences or ends during a calendar month, the rent for any fractional calendar month following the Commencement Date or preceding the end of the Lease Term shall be prorated by days.

**3.03. Late Charges.** Tenant's failure to pay sums due hereunder promptly may cause Landlord to incur unanticipated costs. The exact amount of such costs are impractical or extremely difficult to ascertain. Such costs may include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by any ground lease, deed of trust or mortgage encumbering the Property. Therefore, if any sum due hereunder is not received on its due date, Tenant shall pay the party named in Section 1.13 above a late charge equal to the sum stated in Section 1.14 above for each day from its due date until such delinquent sum is received. If any check tendered in payment of any sum due from Tenant hereunder is returned for any reason, Tenant shall pay a late charge for each day from said due date until such check is made good. The parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of such late payment or such returned check.

**3.04. Security Deposit.** Upon execution hereof, Tenant shall deposit with the party named in Section 1.13 above a cash Security Deposit in the sum stated in Section 1.07. Landlord may apply all or part of the Security Deposit to any unpaid rent or other charges due from Tenant or to cure any other defaults of Tenant. If Landlord uses any part of the Security Deposit, Tenant shall restore the Security Deposit to its full amount within ten (10) days after Landlord's written request. Tenant's failure to do so shall be a material default under this Lease. No interest shall be paid on the Security Deposit. Landlord shall not be required to keep the Security Deposit separate from its other accounts and no trust relationship is created with respect to the Security Deposit. Upon any termination of this Lease not resulting from Tenant's default, and after Tenant has vacated the Property in the manner required by this Lease, Landlord shall refund the unused portion of the Security Deposit to Tenant.

ARTICLE FOUR: TAXES

**4.01. Payment by Landlord.** Landlord shall pay the real estate taxes on the Property during the Lease Term.

**4.02. Payment by Tenant.** Tenant shall pay the party named in Section 1.13 above, as additional rental, the excess, if any, of the real estate taxes for any year during the Lease Term over the real estate taxes for the base year stated in Section 1.12. Tenant shall make such payment within fifteen (15) days after receipt of a statement showing the amount and computation of such increase. Tenant shall be responsible for the pro-rata portion of such additional rental for any fractional part of a year preceding the end of the Lease Term, which prorated sum shall be due and payable upon the termination of this Lease. If the termination of this Lease occurs before the tax rate is fixed for the particular year, the proration shall be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation, and notwithstanding the termination of this Lease, any difference in the actual real estate taxes for such year shall be adjusted between the parties upon receipt of written evidence of the payment thereof.

**4.03 Improvements by Tenant.** In the event the real estate taxes levied against the Property for the real estate tax year in which the Lease Term commences are increased as a result of any alterations, additions or improvements made by Tenant or by Landlord at the request of Tenant, Tenant shall pay to Landlord upon demand the amount of such increase. For the purposes of the calculations under Section 4.02, the amount of the real estate taxes during the real estate tax year in which the Lease Term commences shall not include any taxes resulting from any such alterations, additions or improvements made in or to the Property. Landlord shall obtain from the tax assessor or assessors a written statement of the total amount of such increase.

**4.04. Joint Assessment.** If the real estate taxes are assessed against the Property jointly with other property not constituting a part of the Property, the real estate taxes for such years shall be equal to the amount bearing the same proportion to the aggregate assessment that the total square feet of building area in the Property bears to the total square feet of building area included in the joint assessment.

**4.05. Personal Property Taxes.** Tenant shall pay all taxes charged against trade fixtures, furnishings, equipment or any other personal property belonging to Tenant. Tenant shall try to have its personal property taxed separately from the Property, but if any of Tenant's personal property is taxed with the Property, Tenant shall pay the taxes for the personal property within fifteen (15) days after Tenant receives a statement for such personal property taxes.

ARTICLE FIVE: INSURANCE AND INDEMNITY

**5.01. Casualty Insurance.** During the Lease Term, Landlord shall maintain policies of insurance covering loss of or damage to the Property in such amount or percentage of replacement value as Landlord or its insurance advisor deems reasonable in relation to the age, location, type of construction and physical condition of the Property and the availability of such insurance at reasonable rates. Such policies shall provide protection against all perils included within the classification of fire and extended coverage and any other perils which Landlord deems necessary. Landlord may obtain insurance coverage for Tenant's fixtures, equipment or building improvements installed by Tenant in or on the Property. Tenant shall, at Tenant's expense, maintain such primary or additional insurance on its fixtures, equipment and building improvements as Tenant deems necessary to protect its interest. Tenant shall not do or permit to be done anything which invalidates any such insurance policies. Any casualty insurance which may be carried by Landlord or Tenant shall be for the sole benefit of the party carrying such insurance and under its sole control.

**5.02. Increase in Premiums.** Tenant shall not permit any operation or activity to be conducted or storage or use of any volatile or any other materials on the Property that would cause suspension or cancellation of any fire and extended coverage insurance policy carried by Landlord, or increase the premiums therefor, without the prior written consent of Landlord. If Tenant's use and occupancy of the Property causes an increase in the premiums for any fire and extended coverage insurance policy carried by Landlord on the day before Tenant shall have first gone into possession of the Property under this Lease, Tenant shall pay, as additional rental, the amount of such increase to Landlord upon demand and presentation of written evidence of the increase by Landlord.

loss, expense or claims arising out of such damage or injury. Tenant shall not be liable for any injury or damage caused by the negligence or misconduct of Landlord's employees. Landlord shall indemnify Tenant and hold it harmless from any loss, expense or damage arising out of such damage or injury.

5.05. Waiver of Subrogation. Each party hereto waives any and every claim which arises or may arise in its favor against the other party hereto during the term of this Lease or any renewal or extension thereof for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Property, which loss or damage is covered by valid and collectible fire and extended coverage insurance policies, to the extent that such loss or damage is recoverable under such insurance policies. Such mutual waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of, or damage to, property of the parties hereto. Inasmuch as such mutual waivers will preclude the assignment of any aforesaid claim by way of subrogation or otherwise to an insurance company (or any other person), each party hereby agrees immediately to give to each insurance company which has issued to it policies of fire and extended coverage insurance, written notice of the terms of such mutual waivers, and to cause such insurance policies to be properly endorsed, if necessary, to prevent the invalidation of such insurance coverages by reason of such waivers.

## ARTICLE SIX:  USE OF PROPERTY

6.01. Permitted Use. Tenant may use the Property only for the permitted use stated in Section 1.08.

6.02. Compliance with Law. Tenant shall comply with all governmental laws, ordinances and regulations applicable to the use of the Property, and shall promptly comply with all governmental orders and directives for the correction, prevention and abatement of nuisances in or upon, or connected with the Property, all at Tenant's sole expense.

6.03. Certificate of Occupancy. Tenant may, prior to the commencement of the term of this Lease, apply for a Certificate of Occupancy to be issued by the municipality in which the Property is located, but this Lease shall not be contingent upon issuance thereof. Nothing herein contained shall obligate Landlord to install any additional electrical wiring, plumbing or plumbing fixtures which are not presently existing on the Property, or which have not been expressly agreed upon by Landlord in writing.

6.04. Signs. Without the prior written consent of Landlord, Tenant shall not place or affix any signs or other objects upon or to the Property, including but not limited to the roof or exterior walls of the building or other improvements thereon, or paint or otherwise deface said exterior walls. Any signs installed by Tenant shall conform with applicable laws and deed and other restrictions. Tenant shall remove all signs at the termination of this Lease and shall repair any damage and close any holes caused or revealed by such removal.

6.05. Utility Services. Tenant shall pay the cost of all utility services, including but not limited to initial connection charges, all charges for gas, water and electricity used on the Property, and for all electric lights, lamps and tubes.

6.06. Landlord's Access. Landlord and its authorized agents shall have the right, during normal business hours, to enter the Property (a) to inspect the general condition and state of repair thereof, (b) to make repairs required or permitted under this Lease, (c) to show the property to any prospective tenant or purchaser or (d) for any other reasonable purpose. During the final 150 days of the lease Term, Landlord and its authorized agents shall have the right to erect and maintain on or about the Property customary signs advertising the Property for lease or for sale.

6.07. Quiet Possession. If Tenant pays the rent and complies with all other terms of this Lease, Tenant may occupy and enjoy the Property for the full Lease Term, subject to the provisions of this Lease.

6.08. Exemptions from Liability. Landlord shall not be liable for any damage or injury to the person, business (or any loss of income therefrom), goods, wares, merchandise or other property of Tenant, Tenant's employees, invitees, customers or any other person in or about the Property, whether such damage or injury is caused by or results from: (a) fire, steam, electricity, water, gas or rain; (b) the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures or any other cause; (c) conditions arising on or about the Property or upon other portions of any building of which the Property is a part, or from other sources or places; or (d) any act or omission of any other tenant of any building of which the Property is a part. Landlord shall not be liable for any such damage or injury even though the cause of or the means of repairing such damage or injury are not accessible to Tenant. The provisions of this Section 6.08 shall not, however, exempt Landlord from liability for Landlord's gross negligence or willful misconduct.

## ARTICLE SEVEN:  MAINTENANCE, REPAIRS AND ALTERATIONS

7.01. Acceptance of Premises. Tenant acknowledges that it has fully inspected the Property and accepts the Property in its condition as of the execution of this Lease as suitable for the purposes for which it is leased. Tenant acknowledges that, except as stated in the following sentence, neither Landlord nor an agent of Landlord has made any representation as to the condition of the Property or the suitability of the Property for Tenant's intended use. Landlord represents that on the Commencement Date, the plumbing, electrical system and exterior doors, and any fire protection sprinkler system, heating system, air conditioning equipment and elevators existing on the date of this Lease, are or will be in good operating condition.

7.02. Landlord's Obligation to Repair. Subject to the provisions of Article Eight (Damage or Destruction) and Article Nine (Condemnation) and except for damage caused by any act or omission of Tenant, Landlord shall keep the foundation, roof and the structural portions of exterior walls of the improvements of the Property in good order, condition and repair. However, Landlord shall not be obligated to maintain or repair windows, doors, plate glass or the surfaces of walls. In addition, Landlord shall not be obligated to make any repairs under this Section until a reasonable time after receipt of written notice from Tenant of the need of such repairs. If any repairs are required to be made by Landlord, Tenant shall, at Tenant's sole cost and expense, promptly remove Tenant's fixtures, inventory, equipment and other Property, to the extent required to enable Landlord to make such repairs. Landlord's liability hereunder shall be limited to the cost of such repairs or corrections. Tenant waives the benefit of any present or future law which might give Tenant the right to repair the Property at Landlord's expense or to terminate the Lease because of the condition of the Property.

7.03. Tenant's Obligation to Repair. Subject to the provisions of the last sentence of Section 7.01., the preceding Section 7.02, Article Eight (Damage or Destruction) and Article Nine (Condemnation), Tenant shall, at all times, keep that portion of the Property not required to be maintained by Landlord in good order, condition and repair, including but not limited to repairs (including all necessary replacements) of the windows, plate glass, doors, heating system, air conditioning equipment, fire protection sprinkler system, elevators, interior and exterior plumbing and the interior of the building in general, and including care of landscaping and regular mowing of grass and maintenance of any paving and railroad siding. In addition, Tenant shall, at Tenant's expense, repair any damage to the roof, foundation or structural portions of exterior walls caused by Tenant's acts or omissions. If Tenant fails to maintain and repair the property as required by this Section, Landlord may,

the following materials or equipment without Landlord's prior written consent: any power wiring or power panels; lighting or lighting fixtures; wall coverings; drapes, blinds or other window coverings; carpets or other floor coverings; heaters, air conditioners, or any other heating or air conditioning equipment; fencing or security gates; or other similar building operating equipment and decorations.

## ARTICLE EIGHT: DAMAGE OR DESTRUCTION

8.01. Notice. If the building or other improvements situated on the Property should be damaged or destroyed by fire, tornado or other casualty, Tenant shall immediately give written notice thereof to Landlord.

8.02. Partial Damage. If the building or other improvements situated on the Property should be damaged by fire, tornado or other casualty but not to such an extent that rebuilding or repairs cannot reasonably be completed within 120 days from the date Landlord receives written notification by Tenant of the happening of the damage, this Lease shall not terminate, but Landlord shall, at its sole cost and risk, proceed forthwith and use reasonable diligence to rebuild or repair such building and other improvements on the Property (other than leasehold improvements made by Tenant or any assignee, subtenant or other occupant of the Property) to substantially the condition in which they existed prior to such damage; provided, however, if the casualty occurs during the final 18 months of the Lease Term, Landlord shall not be required to rebuild or repair such damage unless Tenant shall exercise its renewal option (if any is contained herein) within fifteen (15) days after the date of receipt by Landlord of the notification of the occurrence of the damage. If Tenant does not elect to exercise its renewal option or if there is no renewal option contained herein or previously unexercised at such time, this Lease shall terminate at the option of Landlord and rent shall be abated for the unexpired portion of this Lease, effective from the date of actual receipt by Landlord of the written notification of the damage. If the building and other improvements are to be rebuilt or repaired and are untenantable in whole or in part following such damage, the rent payable hereunder during the period in which they are untenantable shall be adjusted equitably.

8.03. Substantial or Total Destruction. If the building or other improvements situated on the Property should be substantially or totally destroyed by fire, tornado or other casualty, or so damaged that rebuilding or repairs cannot reasonably be completed within 120 days from the date Landlord receives written notification by Tenant of the happening of the damage, this Lease shall terminate at the option of Landlord and rent shall be abated for the unexpired portion of this Lease, effective from the date of receipt by Landlord of such written notification. If this Lease is not terminated, the building and the improvements shall be rebuilt or repaired and rent abated to the extent provided under Section 8.02.

## ARTICLE NINE: CONDEMNATION

If, during the term of this Lease or any extension or renewal thereof, all or a substantial part of the Property should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain, or should be sold to the condemning authority under threat of condemnation, this Lease shall terminate and the rent shall be abated during the unexpired portion of this Lease, effective from the date of taking of the Property by the condemning authority. If less than a substantial part of the demised premises is taken for public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or is sold to the condemning authority under threat of condemnation, Landlord, at its option, may by written notice terminate this Lease or shall forthwith at its sole expense restore and reconstruct the buildings and improvements (other than leasehold improvements made by Tenant or any assignee, subtenant or other occupant of the Property) situated on the Property in order to make the same reasonably tenantable and suitable for the use for which the Property is leased as defined in Section 6.01. The rent payable hereunder during the unexpired portion of this Lease shall be adjusted equitably. Landlord and Tenant shall each be entitled to receive and retain such separate awards and portions of lump sum awards as may be allocated to their respective interests in any condemnation proceedings. The termination of this Lease shall not affect the rights of the respective parties to such awards.

## ARTICLE TEN: ASSIGNMENT AND SUBLETTING

Tenant shall not, without the prior written consent of Landlord, assign this Lease or sublet the Property or any portion thereof. Any assignment or subletting shall be expressly subject to all terms and provisions of this Lease, including the provisions of Section 6.01 pertaining to the use of the Property. In the event of any assignment or subletting, Tenant shall remain fully liable for the full performance of all Tenant's obligations under this Lease. Tenant shall not assign its rights hereunder or sublet the Property without first obtaining a written agreement from the assignee or sublessee whereby the assignee or sublessee agrees to be bound by the terms of this Lease. No such assignment or subletting shall constitute a novation. In the event of the occurrence of an event of default while the Property is assigned or sublet, Landlord, in addition to any other remedies provided herein or by law, may at Landlord's option, collect directly from such assignee or subtenant all rents becoming due under such assignment or subletting and apply such rent against any sums due to Landlord hereunder. No direct collection by Landlord from any such assignee or subtenant shall release Tenant from the performance of its obligations hereunder.

## ARTICLE ELEVEN: DEFAULT AND REMEDIES

11.01. Default. The following events shall be deemed to be events of default under this Lease:

(a) Failure of Tenant to pay any installment of the rent or other sum payable to Landlord hereunder on the date that same is due and such failure shall continue for a period of ten (10) days;

(b) Failure of Tenant to comply with any term, condition or covenant of this Lease, other than the payment of rent or other sum of money, and such failure shall not be cured within thirty (30) days after written notice thereof to Tenant;

(c) Tenant or any guarantor of Tenant's obligations hereunder shall generally not pay its debts as they become due or shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors.

(d) Tenant or any guarantor of Tenant's obligations hereunder shall commence any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property.

(e) Any case, proceeding or other action against Tenant or any guarantor of Tenant's obligations hereunder shall be commenced seeking to have an order for relief entered against it as debtor, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and Tenant (i) fails to obtain a dismissal of such case, proceeding, or other action within sixty (60) days of its commencement or (ii) converts the case from one chapter of the Federal Bankruptcy Code to another chapter or (iii) is the subject of an Order of Relief which is not fully stayed within seven business days after the entry thereof.

on demand from time to time any deficiency that may arise by reason of any such reletting. Tenant agrees to pay to Landlord monthly or the brokerage commission, attorneys' fees, remodeling expenses and other expenses of such reletting. In determining the amount of such deficiency, received under such reletting.

(c) Enter upon the Property, by force, if necessary, without terminating this Lease and without being liable for prosecution or for any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease. Tenant agrees to pay Landlord on demand for expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, together with interest thereon at the rate of twelve percent (12%) per annum from the date expended until paid. Landlord shall not be liable for any damages resulting to Tenant from such action, whether caused by negligence of Landlord or otherwise.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the terms, conditions and covenants herein contained.

11.03. Notice of Default. Tenant shall give written notice of any failure by Landlord to perform any of its obligations under this Lease to Landlord and to any ground lessor, mortgagee or beneficiary under any deed of trust encumbering the Property whose name and address have been furnished to Tenant in writing. Landlord shall not be in default under this Lease unless Landlord (or such ground lessor, mortgagee or beneficiary) fails to cure such non-performance within thirty (30) days after receipt of Tenant's notice. However, if such non-performance reasonably requires more than thirty (30) days to cure, Landlord shall not be in default if such cure is commenced within such thirty (30) day period and thereafter diligently pursued to completion.

11.04. Limitation of Landlord's Liability. As used in this Lease, the term "Landlord" means only the current owner or owners of the fee title to the Property or the leasehold estate under a ground lease of the Property at the time in question. Each Landlord is obligated to perform the obligations of Landlord under this Lease only during the time such Landlord owns such interest or title. Any Landlord who transfers its title or interest is relieved of all liability with respect to the obligations of Landlord under this Lease to be performed on or after the date of transfer. However, each Landlord shall deliver to its transferee all funds previously paid by Tenant if such funds have not yet been applied under the terms of this Lease.

## ARTICLE TWELVE: LANDLORD'S LIEN

In addition to the statutory Landlord's lien, Tenant hereby grants to Landlord a security interest to secure payment of all rent and other sums of money becoming due hereunder from Tenant, upon all goods, wares, equipment, fixtures, furniture and other personal property of Tenant situated in or upon the Property, together with the proceeds from the sale or lease thereof. Such property shall not be removed without the consent of Landlord until all arrearages in rent and other sums of money then due to Landlord hereunder shall first have been paid and discharged. Upon the occurrence of an event of default, Landlord may, in addition to any other remedies provided herein or by law, enter upon the Property and take possession of any and all goods, wares, equipment, fixtures, furniture and other personal property of Tenant situated on the Property without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any such sale. Unless otherwise required by law, notice to Tenant of such sale shall be deemed sufficient if given in the manner prescribed in this Lease at least ten (10) days before the time of the sale. Any public sale made under this Article shall be deemed to have been conducted in a commercially reasonable manner if held on the Property or where the property is located, after the time, place and method of sale and a general description of the types of property to be sold have been advertised in a daily newspaper published in Dallas County, Texas, for five consecutive days before the date of the sale. Landlord or its assigns may purchase at a public sale and, unless prohibited by law, at a private sale. The proceeds from any disposition dealt with in this Article, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorneys' fees and legal expenses), shall be applied as a credit against the indebtedness secured by the security interest granted herein. Any surplus shall be paid to Tenant or as otherwise required by law; Tenant shall pay any deficiencies forthwith. Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Uniform Commercial Code in force in the State of Texas. The statutory lien for rent is expressly reserved; the security interest herein granted is in addition and supplementary thereto.

## ARTICLE THIRTEEN: PROTECTION OF LENDERS

13.01. Subordination. Landlord shall have the right to subordinate this Lease to any ground Lease, deed of trust or mortgage encumbering the Property, and advances made on the security thereof and any renewals, modifications, consolidations, replacements or extensions thereof, whenever made or recorded. However, Tenant's right to quiet possession of the Property during the Lease Term shall not be disturbed if Tenant pays the rent and performs all of Tenant's obligations under this Lease and is not otherwise in default. If any ground lessor, beneficiary or mortgagee elects to have this Lease prior to the lien of its ground lease, deed of trust or mortgage and gives written notice thereof to Tenant, this Lease shall be deemed prior to such ground lease, deed of trust or mortgage whether this Lease is dated prior or subsequent to the date of said ground lease, deed of trust or mortgage or the date of recording thereof.

13.02. Attornment. If Landlord's interest in the Property is acquired by any ground lessor, beneficiary under a deed of trust, mortgagee or purchaser at a foreclosure sale, Tenant shall attorn to the transferee of or successor to Landlord's interest in the Property and recognize such transferee or successor as Landlord under this Lease. Tenant waives the protection of any statute or rule of law which gives or purports to give Tenant any right to terminate this Lease or surrender possession of the Property upon the transfer of Landlord's interest.

13.03. Signing of Documents. Tenant shall sign and deliver any instruments or documents necessary or appropriate to evidence any such attornment or subordination or agreement to do so. If Tenant fails to do so within ten (10) days after written request, Tenant hereby makes, constitutes and irrevocably appoints Landlord, or any transferee or successor of Landlord, the attorney-in-fact of Tenant to execute and deliver any such instrument or document.

13.04. Estoppel Certificates.

(a) Upon Landlord's written request, Tenant shall execute, acknowledge and deliver to Landlord a written statement certifying: (i) that none of the terms or provisions of this Lease have been changed (or if they have been changed, stating how they have been changed); (ii) that this Lease has not been cancelled or terminated; (iii) the last date of payment of the Base Rent and other charges and the time period covered by such payment: and (iv) that Landlord is not in default under this Lease (or, if Landlord is claimed to be in default, stating why). Tenant shall deliver such statement to Landlord within ten (10) days after Landlord's request. Any such statement by Tenant may be given by Landlord to any prospective purchaser or encumbrancer of the Property. Such purchaser or encumbrancer may rely conclusively upon such statement as true and correct.

(b) If Tenant does not deliver such statement to Landlord within such ten (10) day period, Landlord, and any prospective purchaser

Principal REALTOR® on the date of the execution of this Lease.

of this Lease (as same may hereafter be extended) or within ten (10) years from the date hereof, whichever shall be the greater period of time, Tenant, its successors or assigns, shall (a) exercise any right or option to renew or extend the term of this Lease (whether contained in this Lease or in any amendment, supplement or other agreement pertaining hereto) or enter into a new lease or rental agreement with Landlord covering the Property, or (b) enter into any lease, extension, renewal, expansion or other rental agreement with Landlord demising to Tenant any premises located on or constituting all or part of any tract or parcel of real property adjoining, adjacent to or contiguous to the Property and owned by Landlord on the date of this Lease, Landlord shall pay to the Principal REALTOR® an additional commission covering the full period of such renewal, extension, lease, expansion or other rental agreement which shall be due on the date of exercise, in the case of the exercise of an option, or the execution, in the case of a lease or other agreement. Such commissions shall be computed under Section 14.01(a) or 14.01(b) above (whichever has been made applicable under Section 1.11A), as if a new lease had been made for such period of time. In the event Tenant, its successors or assigns, should purchase the Property at any time, pursuant to a purchase option contained in this Lease (or any lease, extension, renewal, expansion or other rental agreement upon which an additional commission would be due under the above provisions) or, in the absence of any purchase option or exercise thereof, should purchase the Property within ten (10) years from the date hereof, Landlord shall pay to the undersigned Principal REALTOR® a sales commission in cash equal to the percentage stated in Section 1.11B of the purchase price, payable at closing. Upon closing of the sale, all lease commissions shall terminate if the lease commissions are payable monthly.

14.03. Joint Liability of Tenant. Tenant expressly acknowledges and agrees that if Tenant enters into any new lease, extension, renewal, expansion or other agreement to rent, occupy or purchase any property described in the preceding Section 14.02 within the time specified in such preceding Section, such agreement must be handled by and through the undersigned Principal REALTOR®, otherwise Tenant shall be jointly and severally liable with Landlord for any commissions due to or become due to Principal REALTOR®.

14.04. Sale. In the event of a sale of the Property or the assignment of this Lease by Landlord, Landlord shall obtain from the purchaser or assignee an Assumption Agreement in recordable form whereby such purchaser or assignee agrees to pay the undersigned Principal REALTOR® all commissions payable under this Lease and shall deliver a fully executed counterpart thereof to Principal REALTOR® on the date of closing of the sale of the Property or assignment of this Lease. Landlord shall be released from personal liability for subsequent payments of commissions only upon the delivery of such counterpart of said Assumption Agreement. Landlord expressly agrees that it will not transfer, convey or sell the Property or assign this Lease without first obtaining from the purchaser or assignee such Assumption Agreement. The form of such Assumption Agreement shall be furnished to the Principal REALTOR® at the time Landlord enters into any contract for the sale of the Property or assignment of this Lease.

14.05. Termination. The termination of this Lease by the mutual agreement of Landlord and Tenant, Tenant not being in default hereunder, shall not affect the right of the Principal REALTOR® to continue to receive the monthly commission agreed to be paid by Landlord under Section 14.01(a) above, just as if Tenant had continued to occupy the Property and had paid the monthly rental during the remaining term of this Lease. Termination of this Lease under Article Eight, or Article Nine shall terminate the right to such monthly commission.

14.06. Lien. The Principal REALTOR® is hereby granted a lien against the Property to secure payment of all commissions (including not only the commission originally payable hereunder but also any additional commissions which may hereafter become payable by reason of renewals, new leases, rental agreements, sales or otherwise). This lien is subject to the rights of Tenant under this Lease, but prior and superior to any liens hereafter created against the Property, excepting only liens in favor of banks, insurance companies, building and loan associations and similar regulated financial institutions securing indebtedness incurred for the purposes of acquiring the Property or constructing, repairing, rebuilding or remodeling buildings and other improvements thereon, to all of which liens the lien hereby created shall be subordinate and inferior.

## ARTICLE FIFTEEN: MISCELLANEOUS

15.01. Force Majeure. In the event performance by Landlord of any term, condition or covenant in this Lease is delayed or prevented by any Act of God, strike, lockout, shortage of material or labor, restriction by any governmental authority, civil riot, flood, or any other cause not within the control of Landlord, the period for performance of such term, condition or covenant shall be extended for a period equal to the period Landlord is so delayed or hindered.

15.02. Interpretation. The captions of the Articles or Sections of this Lease are to assist the parties in reading this Lease and are not a part of the terms or provisions of this Lease. Whenever required by the context of this Lease, the singular shall include the plural and the plural shall include the singular. For convenience, each party hereto is referred to in the neuter gender, but the masculine, feminine and neuter genders shall each include the other. In any provision relating to the conduct, acts or omissions of Tenant, the term "Tenant" shall include Tenant's agents, employees, contractors, invitees, successors or others using the Property with Tenant's expressed or implied permission.

15.03. Waivers. All waivers must be in writing and signed by the waiving party. Landlord's failure to enforce any provisions of this Lease or its acceptance of rent shall not be a waiver and shall not prevent Landlord from enforcing that provision or any other provision of this Lease in the future. No statement on a payment check from Tenant or in a letter accompanying a payment check shall be binding on Landlord. Landlord may, with or without notice to Tenant, negotiate such check without being bound to the conditions of such statement.

14.04. Severability. A determination by a court of competent jurisdiction that any provision of this Lease or any part thereof is illegal or unenforceable shall not cancel or invalidate the remainder of such provision or this Lease, which shall remain in full force and effect.

15.05. Joint and Several Liability. All parties signing this Lease as Tenant shall be jointly and severally liable for all obligations of Tenant.

15.06. Incorporation of Prior Agreements; Modifications. This Lease is the only agreement between the parties pertaining to the lease of the Property and no other agreements are effective. All amendments to this Lease shall be in writing and signed by all parties. Any other attempted amendment shall be void.

15.07. Notices. All notices required or permitted under this Lease shall be in writing and shall be personally delivered or shall be deemed to be delivered, whether actually received or not, when deposited in the United States mail, postage pre-paid, registered or certified mail, return receipt requested, addressed as stated herein. Notices to Tenant shall be delivered to the address specified in Section 1.03 above, except that, upon Tenant's taking possession of the Property, the Property shall be Tenant's address for notice purposes. Notices to any

p.................., ...............o and assigns; provided, however, Landlord shall have no obligation to Tenant's successors or assigns unless the rights or interests of such successors or assigns are acquired in accordance with the terms of this Lease.

Case 3:22-cv-01082-N    Document 12    Filed 07/22/22    Page 18 of 30    PageID 124

15.13. Execution as Offer. The execution of this Lease by the first party to do so constitutes an offer to lease the Property. Unless within the number of days stated in Section 1.15 above from the date of its execution by the first party to do so, this Lease is accepted by the other party and a fully executed copy is delivered to the first party, such offer shall be automatically revoked and terminated.

## ARTICLE SIXTEEN: ADDITIONAL PROVISIONS AND RIDERS

Additional provisions may be set forth in the blank space below, and/or a rider or riders attached hereto. If no additional provisions are to be inserted in the blank space below, please draw a line through such space. If no rider or riders are to be attached hereto, please state "no riders" in the blank space below. If a rider or riders are to be attached hereto, please state in the blank space below: "See rider or riders attached," and please have Landlord and Tenant initial all such riders.

EXECUTED as of the date stated in Section 1.01 above.

ATTEST:

_____

ATTEST

_____

LANDLORD: R & C Investments

By: _____

By: _____
NationsBank of Texas, N.A., Trustee
Title: VICE PRESIDENT

Date of Execution by Landlord:
2/15/94

TENANT: Knickerbocker Partition Corporation

BY: _____

Title: _____

Date of execution by Tenant:
3/4/94

None

## **EXHIBIT II**

## **ASSIGNMENT**

[Immediately follows this cover page]

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment") is made and entered into as of January __, 2018 (the "Agreement Date"), by KNICKERBOCKER PARTITION CORP., a New York corporation ("Assignor"), and KNICKERBOCKER BATHROOM PARTITIONS, L.L.C., a New York limited liability company ("Assignee").

## RECITALS:

A.    Futerfas Family Limited Partnership, as successor to Sandstone Development Partners, LLC, as successor to R&C Investments (the "Landlord"), as landlord, and Assignor, as tenant, are parties to that certain Lease Agreement dated February 8, 1994, as amended by that certain First Modification of Lease Agreement, dated February 15, 1999, that certain Second Modification of Lease Agreement, dated January 16, 2004, that certain Third Modification of Lease Agreement, dated December 2006, that certain Fourth Modification to Lease Agreement, dated January 7, 2010, and that certain Fifth Amendment to Lease dated February 2, 2017 (as amended, the "Lease"), pursuant to which Assignor leases from Landlord a building and improvements thereon located at 3230-40 Royalty Row, Irving, Texas, all as more particularly described in the Lease (the "Leased Premises").

B.    Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of _____, 2017 (the "Purchase Agreement"), pursuant to which, among other matters, Assignor has agreed to assign, and Assignee has agreed to assume, the Lease.

C.    Assignor desires to assign the Lease to Assignee, and Assignee desires to accept such assignment and to assume Assignor's liabilities and obligations thereunder, on the terms and conditions set forth in this Assignment.

## AGREEMENTS:

NOW, THEREFORE, for and in consideration of the foregoing and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    Purchase Agreement.    Assignor and Assignee acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Assignment, the terms of the Purchase Agreement shall govern.

2.    Effective Date. The "Effective Date" of this Assignment shall be the later of (a) the Agreement Date, and (b) the date on which Landlord executes and delivers the Consent to Assignment attached hereto. Assignor and Assignee acknowledge and agree that execution by Landlord of such Consent to Assignment shall be a condition precedent to the effectiveness of this Assignment.

26500154v2 60790.003.01

3.     Assignment.   Effective as of the Effective Date, Assignor assigns and conveys to Assignee all of its right, title, and interest under the Lease.  Notwithstanding anything to the contrary, in no event shall Assignor be deemed released from any liability or obligations under the Lease; rather, Assignor shall be and remain liable for the payment and performance of all obligations of "Tenant" under the Lease.

4.     Assumption.   Effective as of the Effective Date, Assignee accepts the foregoing assignment and agrees to assume, pay and perform all obligations, liabilities, responsibilities, undertakings, covenants and agreements of Assignor under the Lease.

5.     Representations.  Assignor hereby represents and warrants as follows to Assignee:

     (a)     Assignor is the tenant under the Lease and is in possession of the Leased Premises;

     (b)     A true and correct copy of the Lease is attached as Exhibit A to the Consent to Assignment;

     (c)     The Lease is valid and in full force and effect on the Effective Date;

     (d)     The Lease is the only agreement between Landlord and Assignor affecting or relating to the Leased Premises;

     (e)     There exists no breach, default or event or condition which, with the giving of notice or lapse of time or both, would constitute a breach or default under the Lease by either Landlord or Assignor; and

     (f)     The current Lease term commenced on February 1, 2017 and is currently scheduled to expire on January 31, 2020.

Assignor and Assignee acknowledge and agree that as a condition to its execution and delivery of the Consent to Assignment attached hereto, Landlord shall be entitled to rely, and will rely, on the representations and warranties of Assignor set forth above being true and accurate as of the Agreement Date and the Effective Date, and that upon the Effective Date the representations and warranties of Assignor set forth above shall be deemed made to Landlord (and may be relied upon by Landlord) as if set forth in a separate writing executed and delivered by Assignor.

6.     Indemnity.   Assignor shall indemnify, defend and hold Assignee harmless from and against any and all claims, demands, suits, actions, liabilities and expenses (including, without limitation, reasonable attorneys' fees): (a) that arise out of or result from Assignor's failure to perform its obligations and liabilities under this Assignment; or (b) that arise out of or result from Assignor's failure to perform its obligations as tenant under the Lease prior to the Effective Date. Assignee shall indemnify, defend, and hold Assignor harmless from and against any and all claims, demands, suits, actions, liabilities, and expenses (including, without limitation, reasonable attorneys' fees): (a) that arise out of or result from Assignee's failure to perform its

2

obligations and liabilities under this Assignment: or (b) that arise out of or result from Assignee's failure to perform its obligations as tenant under the Lease arising from and after the Effective Date.

7.  Authority.  Each of Assignor and Assignee hereby represents that the signatory signing on its behalf has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting.

8.  Binding Effect.  This Assignment shall be binding upon Assignor and Assignee and their respective successors and assigns.

9.  Counterparts.  This Assignment may be executed in multiple counterparts, and in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  The parties may deliver such counterparts by facsimile and/or email transmission, which shall be binding.

10.  Severability.  If any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction or as a result of further legislative action, such holding or action shall be strictly construed and shall not affect the validity or effect of any other provision hereof, as long as the remaining provisions, taken together, are sufficient to carry out the overall intentions of the parties as evidenced hereby.

11.  Governing Law.  This Assignment shall be governed by, and construed in accordance with, the laws of the State of Texas.


*[The balance of this page is blank – signatures appear on the following pages]*

3

IN WITNESS WHEREOF. the parties hereto have executed this Assignment as of the Agreement Date. to be effective as of the Effective Date.

**ASSIGNOR:**

KNICKERBOCKER PARTITION CORP..
a New York corporation

By: _____
    Stewart Markbreiter. President

**ASSIGNEE:**

KNICKERBOCKER BATHROOM PARTITIONS. L.L.C.,
a New York limited liability company

By: _____
    Name:
    Title:

4

26500154v2 60790.003.01

KPC 021

## CONSENT TO ASSIGNMENT

The undersigned, the Landlord under the Lease referenced in the foregoing Assignment and Assumption of Lease (the "Assignment"; capitalized terms used in this Consent to Assignment and not defined having the meaning set forth in the Assignment), hereby consents to the Assignment subject to the terms and conditions set forth in this Consent to Assignment. In no event shall the foregoing consent by Landlord to this Assignment be deemed a consent to any other or further assignment or other transfer of the Lease. Further, and notwithstanding anything to the contrary, Landlord's consent to this Assignment is made with the express understanding and on the express condition that (i) Assignor is and shall be and shall remain liable for the payment and performance of all obligations of "Tenant" under the Lease, and (ii) the representations and warranties of Assignor set forth in Paragraph 5 are true and accurate as of the Effective Date.

Dated: November 4, 2017

**LANDLORD:**

FUTERFAS FAMILY LIMITED PARTNERSHIP,
a Texas limited partnership

By: _____
Name: Glenn Futerfas
Title: Landlord

5

26500154v2 60790.003.01

KPC 022

# EXHIBIT III

# BILL OF SALE

[Immediately follows this cover page]

## BILL OF SALE AND BLANKET ASSIGNMENT

**FUTERFAS FAMILY LIMITED PARTNERSHIP**, a Texas limited partnership ("Grantor"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to Grantor in hand paid by **HICKORY POINTE, LLC**, an Iowa limited liability company ("Grantee"), has GRANTED, SOLD, ASSIGNED, TRANSFERRED, CONVEYED, and DELIVERED and does by these presents GRANT, SELL, ASSIGN, TRANSFER, CONVEY, and DELIVER unto Grantee, all of Grantor's right, title and interest in and to all the following described properties, rights, and interests arising or used in connection with that certain real property described on Exhibit A attached hereto and incorporated herein by reference (the "Property"):

(a)    All (i) mechanical systems and related equipment owned by Grantor and attached to or located upon the Property, including, but not limited to, electrical systems, plumbing systems, heating systems, air conditioning systems, (ii) maintenance equipment, supplies and tools owned by Grantor and used in connection with the Property, and (iii) other machinery, equipment, fixtures, supplies (including marketing supplies) and personal property of every kind and character owned by Grantor and located in or on or used in connection with the Property or the operations thereon (the "Personal Property");

(b)    Grantor's interest as lessor in all leases and subleases and other rental agreements (written or verbal) that grant a possessory interest in and to the Property (the "Tenant Leases"), and all security deposits (or other security), fees and prepaid rents paid in connection with the Tenant Leases;

(c)    Grantor's interest in any and all furniture, fixture and equipment leases relating to furniture, fixtures or equipment located on the Property (the "Personal Property Leases"), to the extent the same are assignable by Grantor (the "Leased Personalty");

(d)    Grantor's interest in all site plans, surveys, plans and specifications (to the extent Grantor owns and has rights to transfer such property), floor plans and tenant correspondence files in Grantor's possession or in the possession of Grantor's leasing and management agents for the Property and which relate to the Property, the Personal Property, the Personal Property Leases, or the Leased Personalty; and

(e)    All intangible property owned or held by Grantor or in which Grantor has an interest, if any, in connection with any of the Property or the operations thereon, and the right to the use thereof.

The property described in subparagraphs (a) through (e) above is hereinafter referred to as the "Assigned Property".

TO HAVE AND TO HOLD the Assigned Property unto Grantee, its successors and assigns, forever, and Grantor hereby warrants title to the Assigned Property to Grantee and Grantee's successors and assigns against all lawful claims, when the claim is by, through or under Assignor, but not otherwise.

OTHER THAN (I) THE EXPRESS REPRESENTATIONS AND/OR WARRANTIES OF GRANTOR, AS SELLER, SET FORTH IN THAT CERTAIN COMMERCIAL CONTRACT OF SALE PERTAINING TO THE PURCHASE AND SALE OF THE ASSIGNED PROPERTY BY AND BETWEEN GRANTOR AND GRANTEE WITH AN EFFECTIVE DATE OF JUNE 10, 2019 (THE "CONTRACT") WHICH ARE INTENDED TO SURVIVE THE EXECUTION AND DELIVERY OF THIS BILL OF SALE AND BLANKET ASSIGNMENT PURSUANT TO SECTION 16.G OF THE CONTRACT AND (II) GRANTOR'S WARRANTY OF TITLE CONTAINED IN THIS BILL OF SALE AND BLANKET ASSIGNMENT (ITEMS I AND II ABOVE ARE COLLECTIVELY REFERRED TO HEREIN AS THE "GRANTOR'S SURVIVING REPRESENTATIONS AND

WARRANTIES"), GRANTOR HEREBY DISCLAIMS ANY WARRANTY, COVENANT, OR GUARANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, AND GRANTOR SHALL HAVE NO LIABILITY TO GRANTEE AND GRANTEE RELEASES GRANTOR FROM ANY LIABILITY (INCLUDING, BUT NOT LIMITED TO, ACTIONS FOR CONTRIBUTION OR INDEMNITY), FOR, CONCERNING, OR REGARDING (A) THE NATURE AND CONDITION OF THE PERSONAL PROPERTY, INCLUDING, BUT NOT LIMITED TO, THE SUITABILITY THEREOF FOR ANY ACTIVITY OR USE, OR (B) THE COMPLIANCE OF THE PERSONAL PROPERTY WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY. THE CONVEYANCE OF THE PERSONAL PROPERTY IS BEING MADE ON AN "AS IS" BASIS, AND EXCEPT FOR THE GRANTOR'S SURVIVING REPRESENTATIONS AND WARRANTIES, GRANTOR MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH WARRANTIES AND REPRESENTATIONS, TO THE FULLEST EXTENT PERMITTED BY LAW, ARE EXPRESSLY DISCLAIMED.

Grantor also hereby assigns all warranties and guaranties of third parties owned by Grantor (if any) pertaining to the Personal Property (if and to the extent assignable). Grantor agrees to cooperate reasonably, but without any cost or expense to Grantor, with Grantee in securing the performance of any warrantor or guarantor under any such warranty or guaranty assigned to Grantee pursuant to this Bill of Sale and Blanket Assignment or any work that Grantee believes should be performed by any warrantor or guarantor pursuant to such warranties or guaranties. Grantor does not, however, guarantee or warrant the performance of any work pursuant to any warranty or guaranty assigned hereunder.

Grantor hereby agrees to indemnify, hold harmless and defend Grantee from and against any and all third party obligations, liabilities, costs and claims (including reasonable attorneys' fees) arising as a result of or with respect to the failure of Grantor to perform any of the obligations of the landlord under the Tenant Leases that arise or accrue prior to the Effective Date (hereinafter defined) other than that certain Commercial Lease Agreement dated May 1, 2019 between Grantor, as landlord, and Grantee's affiliate Specialized Petroleum Services DFW, LLC, as tenant (the "Specialized Petroleum Lease"). For the avoidance of doubt, Grantor has not agreed, and does not agree hereby, to indemnify, hold harmless or defend Grantor with respect to any obligations, liabilities, costs or claims of any kind or nature arising under or with respect to the Specialized Petroleum Lease, whether known or unknown and whether now existing or hereafter arising (collectively, "Specialized Petroleum Lease Claims"), and effective from and after the Effective Date, Grantee hereby releases Grantor and its employees, general partners, limited partners, affiliates, contractors, agents and representatives from, and waives with respect to Grantor and all such other parties, any and all Specialized Petroleum Lease Claims.

Grantee agrees to indemnify, hold harmless and defend Grantor from and against any and all third party obligations, liabilities, costs and claims (including reasonable attorneys' fees) arising as a result of or with respect to the failure of Grantee to perform any of the obligations of the landlord under the Tenant Leases that arise or accrue from and after the Effective Date.

*[Signatures and acknowledgments begin on the following page]*

IN WITNESS WHEREOF, Grantor and Grantee have caused this Bill of Sale and Blanket Assignment to be executed effective as of August **14** , 2019 (the "Effective Date").

**GRANTOR:**

**FUTERFAS FAMILY LIMITED PARTNERSHIP,**
a Texas limited partnership

By: _____
Name: F. Lawrence Futerfas
Title: General Partner


STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

THIS INSTRUMENT WAS ACKNOWLEDGED before me on the **19th** day of August  2019, by F. Lawrence Futerfas, represented to me to be the General Partner of **FUTERFAS FAMILY LIMITED PARTNERSHIP,** a Texas limited partnership, on behalf of said general partnership.

R. A. BLANSHARD
Notary Public
State of Texas
ID # 135379-7
My Comm. Expires 08-16-2020

_____
Notary Public, State of Texas
Printed Name:
Commission expires:

**GRANTEE:**

**HICKORY POINTE, LLC,**
an Iowa limited liability company

By: _____
Name: Jason Starr
Title: Manager


STATE OF TEXAS                    §
                                  §
COUNTY OF DALLAS                  §

    THIS INSTRUMENT WAS ACKNOWLEDGED before me on the 15th day of August 2019, by Jason Starr, represented to me to be the Manager of **HICKORY POINTE, LLC,** an Iowa limited liability company, on behalf of said limited liability company.


R. A. BLANSHARD
Notary Public
State of Texas
ID # 135379-7
My Comm. Expires 08-16-2020

_____
Notary Public, State of Texas
Printed Name:
Commission expires:

## EXHIBIT "A"

### PROPERTY DESCRIPTION

BEING all of Lots 24 and 25, Block A of the Freeway Industrial District, an Addition to the City of Irving, Dallas County, Texas, according to the plat thereof recorded in Volume 402, Page 1437, Map Records, Dallas County, Texas, and being the same tract of land conveyed to Sandstone Development Partners, LLC, a Texas limited liability corporation, by Deed recorded in Volume 2002168, Page 8763, Deed Records, Dallas County, Texas, being more particularly described by as follows:

BEGINNING at a 1/2 inch iron rod found in the Southwest right-of-way line of Royalty Row (60 foot right-of-way), said point being at the North corner of Lot 23 of said Freeway Industrial District;

THENCE South 24 degrees 06 minutes 00 seconds West, along the Northwest line of said Lot 23, a distance of 200.00 feet to a 5/8 inch iron rod found at the East corner of Lot 10 of said Freeway Industrial District;

THENCE North 65 degrees 54 minutes 00 seconds West, along the Northeast line of said Lot 10, passing the East corner of Lot 9 of said Freeway Industrial District, a distance of 100.00 feet and continuing along the Northeast line of said Lot 9, for a total distance of 200.00 feet to a 5/8 inch iron rod found at the South corner of Lot 26 of said Freeway Industrial District;

THENCE North 24 degrees 06 minutes 00 seconds East, along the Southeast line of said Lot 26, a distance of 200.00 feet to a 5/8 inch iron rod found in the Southwest right-of-way line of said Royalty Row;

THENCE South 65 degrees 54 minutes 00 seconds East, along the Southwest right-of-way line of said Royalty Row, a distance of 200.00 feet to the POINT OF BEGINNING and containing 40,000 square feet or 0.92 acres of land, more or less.